IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, : | |
| : | |
| Plaintiff, : | |
| : | CIVIL ACTION NO. 05-318J |
| v. : | |
| : | |
| CONEMAUGH VALLEY MEMORIAL : | |
| HOSPITAL t/d/b/a MEMORIAL MEDICAL : | |
| CENTER, CONEMAUGH HEALTH SYSTEM, : | |
| INC., UPMC LEE REGIONAL HOSPITAL : | |
| AND UPMC, d/b/a UNIVERSITY OF : | |
| PITTSBURGH MEDICAL CENTER, : | |
| : | |
| Defendants. : | |

## FINAL ORDER

Conemaugh Valley Memorial Hospital, t/d/b/a Memorial Medical Center ("Memorial"), Conemaugh Health System, Inc. ("CHS"), UPMC Lee Regional Hospital ("UPMC Lee") and UPMC d/b/a University of Pittsburgh Medical Center ("UPMC") agreed in a letter of intent dated August 18, 2004, and then in a definitive agreement dated December 20, 2004, as amended, that CHS, together with Memorial, would acquire certain assets of UPMC Lee in Johnstown, Pennsylvania. The Office of Attorney General of the Commonwealth ("Attorney General") is responsible for reviewing transactions effecting a fundamental corporate change which involve a transfer of ownership that could have a competitive impact in the Commonwealth. CHS, together with Memorial, and UPMC, have cooperated fully with the Attorney General's investigation of the proposed acquisition. The Attorney General has concluded its investigation of the proposed acquisition, during which some concerns were raised regarding the impact of this

transaction on competition for healthcare services and the economy of Cambria and Somerset Counties in Western Pennsylvania. CHS, together with Memorial, and UPMC, do not believe that the consolidation impairs access or will adversely impact competition and the economy of Cambria and Somerset Counties. CHS, together with Memorial, and UPMC, deny that this transaction will violate the federal antitrust laws. Conemaugh and UPMC do not admit liability under the antitrust laws by agreeing to this Final Order. Conemaugh desires to assure the Attorney General that it intends to operate Conemaugh, with the UPMC Lee assets, in accordance with its mission and continue its commitment of providing quality, affordable, and accessible health care to the community.

It is hereby **ORDERED**:

### I. Introduction

1. CHS is a not-for-profit health care provider based in Johnstown Pennsylvania, which operates, *inter alia*, Memorial, a hospital in Johnstown, Pennsylvania, and a number of small hospitals that serve, *inter alia*, Cambria and Somerset Counties. UPMC Lee is a not-for-profit health care provider based in Johnstown, Pennsylvania, and is part of the UPMC Health System. Because of a decline in population and a decline in overall economic activity in Cambria and Northern Somerset Counties, Conemaugh and UPMC believe the Johnstown area can no longer support two hospitals without incurring substantial losses.

2. The Attorney General is concerned that CHS, together with Memorial, after acquisition of certain UPMC Lee assets, will raise prices. The Commonwealth, private firms other government agencies, and other organizations operate Health

Plans or purchase services from Health Plans which include the hospital services provided by Conemaugh and UPMC Lee. The government agencies and firms make choices among competing products based on, among other things, prices. The Attorney General believes that these entities pass most, if not all, price increases or price savings in the cost of health care to employees and to program beneficiaries or charge employees for the extra cost of health insurance. Therefore, the Attorney General believes that any increase in prices by Conemaugh will be borne by agencies and employers and, ultimately, by beneficiaries and employees.

## II. Jurisdiction

3. This Court has jurisdiction over the subject matter of this action and each of the parties consenting to this Final Order. The complaint states a claim upon which relief may be granted.

## III. Definitions

As used in this Final Order:

4. Conemaugh Health System, Inc. ("CHS") means the not-for-profit, tax-exempt healthcare provider based in Johnstown, Pennsylvania, which operates, *inter alia*, Memorial, a hospital in Johnstown, Pennsylvania. CHS is a corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 1086 Franklin Street, Johnstown, PA 15905, and is the sole corporate member of Conemaugh Valley Memorial Hospital (t/d/b/a Memorial

3

Medical Center) ("Memorial"); Windber Medical Center ("Windber"), a not-for-profit hospital located in Windber, Somerset County, Pennsylvania; and Meyersdale Medical Center ("Meyersdale"), a not-for-profit hospital located in Meyersdale, Somerset County, Pennsylvania. CHS is one of the two corporate members of Miners Medical Center ("Miners"), a not-for-profit hospital located in Hastings, Cambria County, Pennsylvania.

5. "UPMC Health System" (d/b/a University of Pittsburgh Medical Center) ("UPMC") means the not-for-profit, tax-exempt corporation organized under the laws of the Commonwealth of Pennsylvania having its principal address at 200 Lothrop Street, Pittsburgh, PA 15213. It is the parent of UPMC Lee Regional Hospital and many other hospitals throughout western Pennsylvania and the corporate parent of Community Nursing, Inc., a Pennsylvania not-for-profit corporation having its principal address at 119 Walnut Street, Johnstown, PA 15901.

6. UPMC Lee Regional Hospital ("UPMC Lee") means the not-for-profit health care provider based in Johnstown, Pennsylvania, that is part of UPMC. UPMC Lee is a corporation organized under the laws of the Commonwealth of Pennsylvania, having its principal address at 320 Main Street, Johnstown, PA 15901.

7. "Conemaugh" means Memorial after the acquisition of the UPMC Lee assets pursuant to the December 20, 2004, Asset Purchase Agreement, as amended.

8. "Member Hospitals" means Windber, Meyersdale and Miners.

9. "Managed-Care Plan" means a health maintenance organization, preferred provider organization or other health-service purchasing program which uses financial or other incentives to prevent unnecessary services and includes some form of utilization review.

10. "Health Plans" means all types of organized health-service purchasing programs, including, but not limited to, health insurance and managed-care plans, offered by government, for-profit or non-profit, third-party payors, health care providers or any other entity.

11. "Health-Care Provider" means hospitals, laboratories, physicians, physician networks and other health care professionals.

12. "Acquire" means to purchase the whole or the majority of the assets, stock, equity, capital or other interest of a corporation or other business entity or to receive the right or ability to designate or otherwise control the majority of directors or trustees of a corporation or other business entity.

13. "Hospital" means a health care facility, licensed as a hospital, having a duly-organized governing body with overall administrative and professional responsibility and an organized professional staff that provides 24-hour inpatient care, that may also provide outpatient services, and that has as a primary function the provision of inpatient services for medical diagnosis, treatment and care of physically injured or sick persons with short-term or episodic health problems or infirmities.

14. "Geographic Market," for purposes of this Final Order and not with Defendants agreeing that this constitutes the relevant geographic market for antitrust purposes,

means the Pennsylvania county of Cambria County and the following zip codes in northern Somerset County: 15531, 15937, 15928, 15935, 15953 and 15963.

15. "Most Favored Nations Clause" means any term in a provider contract that allows the buyer to receive the benefit of a better payment rate, term or condition than the seller gives another provider for the same service.

16. "Unreasonably Terminate" means to terminate for any reason other than cause.

## IV. Terms

17. **Good Faith Negotiations Between Conemaugh and Health Plans.**

    17.1. Conemaugh shall negotiate in good faith concerning contracts for its inpatient and outpatient hospital services.

    17.2. Conemaugh, Memorial or UPMC Lee shall not Unreasonably Terminate any provider contracts after the date of this Final Order to which Conemaugh, Memorial or UPMC Lee are parties as of the date of entry of this Final Order. However, such contracts may expire at the end of their term and not be considered Unreasonably Terminated by Conemaugh, Memorial or UPMC Lee in violation of this Final Order. Any renewals would be subject to Paragraphs 17.4 through 17.14.

    17.3. Any Health Plan licensed by the Pennsylvania Insurance Department to serve Cambria County, Pennsylvania, and which has at least 50,000 covered lives nationwide, or any Health Plan which currently has a contract with Conemaugh, Memorial or UPMC Lee after August 1, 2005, seeking a contract, may at its option, agree to participate in the two-step

contract resolution provisions of this Final Order contained in Paragraphs 17.4 to 17.14, by opting in, as set forth in Paragraph 17.4.

    A.    **First Step** - period of good faith negotiations. If no contract is reached during the period;

    B.    **Second Step** - the Health Plan may request binding arbitration as outlined in Paragraphs 17.4 to 17.14.

17.4. A Health Plan must give written notice to Conemaugh of its agreement to opt in and utilize the contract resolution provisions of this Final Order at least ninety (90) days prior to the expiration of its existing contract with Conemaugh. If a Health Plan does not have an existing contract with Conemaugh, the Health Plan must give such notice within thirty (30) days after it has notified Conemaugh, in writing, of its interest in a contract with Conemaugh. A failure to opt in to this contract resolution provision is deemed an opt out.

17.5. As the First Step, a Health Plan shall negotiate in good faith toward a contract for Conemaugh's inpatient and outpatient hospital services for at least ninety (90) days. At the conclusion of the ninety- (90) day negotiation period, the Health Plan may trigger binding arbitration before an independent body and must do so within thirty (30) days after the conclusion of good faith negotiations.

17.6 A Health Plan must make a written request to Conemaugh in order to trigger binding arbitration.

A. The arbitration panel will be an independent body made up of five representatives. A representative or his or her employer shall have none of the following relationships, currently or within the past five years, with either Conemaugh or the Health Plan: employment, board membership, staff privileges, consultant or advisor. The Mayor of Johnstown shall appoint one member; the Johnstown Chamber of Commerce shall appoint one member from an employer with less than 100 employees; the Greater Johnstown Regional Partnership shall appoint one member from an employer with more than 100 employees; Conemaugh shall appoint one member and the Health Plan shall appoint one member.

B. The Health Plan and Conemaugh shall each submit to the independent body its last contract offer and a statement of contract issues outlining those which have been agreed to and those which remain in dispute.

C. The independent body may reject a request for arbitration if the disputed contract issues and terms exceed the agreed upon contract issues and terms and order the parties to engage in another sixty (60) days of negotiation.

D. The independent body may retain such experts or consultants, none of whom have any of the following relationships, currently or within the past five years, with either Conemaugh or the Health Plan: employment, board membership, staff privileges, consultant

    or advisor to aid it in its deliberations. The cost of such experts or consultants shall be divided equally between the Health Plan on the one hand and Conemaugh on the other hand.

17.7. If, during the course of the negotiation process outlined above, Conemaugh or the Health Plan has failed to propose material contract terms prior to arbitration, the arbitration panel shall impose the proposed terms of the party which did make a proposal. If both sides submit proposed contracts, the independent body shall inform Conemaugh and the Health Plan of information the independent body believes would be helpful in making a decision. The independent body shall not prohibit the presentation to it for consideration of information by Conemaugh or the Health Plan but must consider the following:

  A. The current contract between the Health Plan and Conemaugh.

  B. Reimbursement rates paid by the Health Plan for Altoona Regional Health System, Indiana Regional Medical Center, Westmoreland Regional Hospital (or its successor), Hamot, St. Vincent Health Center, The Washington Hospital, Mercy Hospital Pittsburgh and The Western Pennsylvania Hospital.

  C. The weighted average rates of the hospitals identified in 17.7B above for commercial, Medicare managed care and Medicaid managed care product lines, for all payors.

  D. The costs incurred in providing services to Conemaugh's patients.

  E. The rate of increase or decrease in the median family income for Cambria County as measured by the United States Department of Labor, Bureau of Labor Statistics.

  F. The actuarial impact of a proposed contract or rates paid by the Health Plan and a comparison of these rates in Pennsylvania with health plan rates in other parts of the country.

  G. The expected patient volume which likely will result from the contract.

  H. The independent body shall not consider the extent to which a Health Plan is or is not purchasing other hospital or physician services from Conemaugh.

  I. Whether a price proposed by Conemaugh would subsidize the UPMC Health Plan, the Penn Highlands Plan or any other Health Plan acquired by Conemaugh or that acquires Conemaugh's Health Plans.

17.8. Once the arbitration process has been invoked, the independent body shall set rules for confidentiality, exchange and verification of information and procedures to ensure the fairness for all involved and the confidentiality of the process and outcome. In general, the Health Plan and Conemaugh may submit confidential, competitively-sensitive information. Therefore, the independent body should ensure that it, and any consultants it retains, do not disclose this information to other Health Plans or to other hospitals.

17.9. The independent body may select either the Health Plan's contract terms or the contract terms of Conemaugh, whichever is applicable, or impose contract terms it believes are reasonable. The parties are bound by the decision of the independent body.

17.10. Because of the important interests affected, the independent body shall commence the arbitration process within twenty (20) days after it is triggered by written request from a Health Plan. It shall hold an arbitration hearing, not to exceed three (3) days, within sixty (60) days of the commencement of the arbitration process. The independent body shall render its determination within seven (7) days after the conclusion of the hearing. The parties, by agreement, or the independent body, because of the complexity of the issues involved, may extend any of the time periods in this section, but the arbitration process shall take no more than ninety (90) days from its commencement.

17.11. Conemaugh and the Health Plan shall each bear the cost of their respective presentations to the independent body and shall each bear one-half of any other costs associated with the independent review.

17.12. During the above arbitration process, if a Health Plan has a contract for Conemaugh's services, it will continue to pay the reimbursement rates set forth in that contract. This amount will be adjusted retroactively to reflect the actual pricing determined by the independent body.

17.13. If a Health Plan has no contract for Conemaugh's services, the Health Plan shall pay for all services by Conemaugh, for which payment has not been

made, an amount equal to rates proposed in its contract. This amount will be adjusted retroactively to reflect the actual pricing determined by the independent body.

17.14. If the amounts paid pursuant to Paragraphs 17.12 and 17.13 are less than the amounts owed under the contract awarded as the result of arbitration, the Health Plan shall pay interest on the difference. If the amounts paid pursuant to Paragraphs 17.12 and 17.13 are greater than the amounts owed under the contract awarded as the result of arbitration, Conemaugh shall pay interest on the difference. For purposes of calculating interest due under this paragraph, the interest rate shall be the U.S. prime lending rate offered by First Commonwealth Bank or its successor as of the date of the independent body's decision on arbitration.

18. **Staff Privileges**

18.1. Conemaugh shall provide an open medical staff to all qualified physicians in the Geographic Market as set forth in the current Memorial medical staff bylaws and credentialing standards, as well as the requirements of the Joint Commission on Accreditation of Healthcare Organizations and consistent with practices and contractual obligations at Conemaugh relating to physician services at Conemaugh offered pursuant to exclusive contracts, *e.g.*, radiology, pathology, anesthesiology, emergency medicine, behavioral health and cardiothoracic surgery.

18.2. Employment by Conemaugh or participation in the Penn Highlands or UPMC Health Plan shall not be criteria for granting staff privileges at Conemaugh, subject to the contractural obligations set forth in 18.1 above.

18.3. Conemaugh shall not prohibit, as a condition of staff privileges at Conemaugh, a physician from practicing at other hospitals subject to the contractual obligations set forth in 18.1 above. Conemaugh shall not engage in "economic credentialing" meaning that staff privileges at Conemaugh are granted on the amount of business or patients a physician brings or may bring to Conemaugh unless related to quality of care requirements.

19. **Operating Room Scheduling** - If historic use is used to calculate the amount and location on the schedule of a physician's or group practice's block time, the calculation shall include, on an equal basis, that physician's or group practice's historic use of both Memorial's and UPMC Lee's operating rooms.

20. **Nonexclusivity**

20.1. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not enter into a provider contract with any Health Plan on terms which prohibit Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, from contracting with any other Health Plan for any services Conemaugh, CHS or its Member Hospitals offer.

20.2. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not enter into a provider contract with any Health Plan on terms

which prohibit the Health Plan from contracting with any other health care provider for physician services.

20.3. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not prohibit physicians, who are members in any Conemaugh, CHS or Member Hospitals' physician-hospital network, but who are not employees of Conemaugh, CHS or its Member Hospitals, from participating in any other physician-hospital networks, Health Plans or integrated delivery systems.

21. **Non-Tying Provision**

21.1. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not require a Health Plan, network or other payor to have a contract with Conemaugh, CHS or its Member Hospitals for non-hospital services or physician services, as a condition of having a contract for Conemaugh, CHS or its Member Hospitals' hospital services.

21.2. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not require that a Health Plan, network or other payor agree not to contract with certain hospitals, health systems or other providers as a condition of having a contract for Conemaugh, CHS or its Member Hospitals' hospital services.

21.3. Conemaugh, CHS or CHS, if acting on behalf of its Member Hospitals, shall not require a hospital, health system or other provider to have a contract with the Penn Highlands or UPMC Health Plan in order for that